United States District Court
District of Massachusetts

| | |
|---|---|
| FRANCINE NICHOLSON,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | Civil Action No. |
| v.    ) | 22—11322-NMG |
| ) | |
| MASSACHUSETTS BAY TRANSPORTATION ) | |
| AUTHORITY,    ) | |
| ) | |
| Defendant.    ) | |
| ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises from allegations of employment·
discrimination brought by Francine Nicholson ("Nicholson" or
"plaintiff"), a trolley operator for the Massachusetts Bay
Transportation Authority ("MBTA" or "defendant"). Plaintiff
alleges that she was subjected to ongoing harassment by an MBTA
passenger, Jeffrey Ferrari ("Ferrari"), and that the MBTA failed
to take adequate steps to protect her safety. She further
claims that the MBTA did not reasonably accommodate her
resulting post-traumatic stress disorder ("PTSD").

In August, 2022, Nicholson filed this action in the
Massachusetts Superior Court for Suffolk County, asserting
claims under both state and federal law, including violations of

-1-

the Americans with Disabilities Act ("ADA").  The MBTA timely removed the case to this Court, asserting federal question jurisdiction.

I.  **Background**

   a. **The Parties**

   Plaintiff, Francine Nicholson, resides in Brockton, Massachusetts, and began her employment with the MBTA in 2015.

   Defendant, Massachusetts Bay Transportation Authority, is a "public employer" as defined under the Massachusetts Tort Claims Act, M.G.L. c. 258, § 1.  The MBTA maintains its principal place of business in Boston, Massachusetts, and operates a light-rail trolley system called the "Green Line" in the Boston metropolitan area.  The Green Line is composed of four branches: the Boston College "B" line, the Cleveland Circle "C" line, the Riverside "D" line and the Heath Street "E" line.

   At all relevant times, the following individuals were employed in various divisions of the MBTA.  Ahlam Samrin ("Samrin"), William Cameron ("Cameron"), Alicia Gomes ("Gomes"), Tamieka Thibodeaux ("Thibodeaux"), Temesha Allen ("Allen") and Margaret Fong ("Fong") worked in light-rail operations as instructors or supervisors.[1]  Michael Rutledge ("Detective

_____

[1] Plaintiff employs several iterations of the spelling of Ms. Allen's first name throughout the pleadings.

-2-

Rutledge"), Sean Conway ("Detective Conway"), Daniel Morse ("Officer Morse") and Fred Holt ("Inspector Holt") were employees with the MBTA Transit Police Department ("TPD").

**b. The January, 2018 Incident**

As of January, 2018, Nicholson was employed as a motorperson, i.e., a trolley operator, on the Green Line. She worked a so-called "split shift," operating trolleys on the "B" line for the first half of her shift and the "C" line for the second half.

Nicholson worked primarily out of a large campus for the Green Line located in Chestnut Hill, Massachusetts. The so-called "Reservoir Campus" encompasses the Reservoir Yard (where trolleys are stored between trips), the Car House (where trolleys are repaired and maintained) and the Reservoir Station trolley stop. The campus serves as the terminal for all "B" line and "C" line trolleys entering and going out of service.

In close proximity to Reservoir Campus is a Dunkin Donuts shop, located at 1995 Beacon Street ("the Dunkin Donuts"). MBTA employees assigned to the Reservoir Campus, including Nicholson, often patronized that Dunkin Donuts before, during and after their shifts.

At some point prior to January, 2018, Jeffrey Ferrari ("Ferrari"), a member of the public and frequent Green Line

Case 1:22-cv-11322-NMG    Document 62    Filed 05/12/25    Page 4 of 41

passenger, began visiting the same Dunkin Donuts and attempted
to befriend Nicholson.  According to her, Ferrari was overly
complimentary about her appearance but she kept the
conversations to a minimum.

On January 22, 2018, a manager at the Dunkin Donuts shop
approached Samrin, an MBTA light-rail operations instructor, to
report disconcerting behavior he had witnessed by Ferrari
directed toward Nicholson.  According to the manager, Ferrari
visited the store multiple times a day and requested information
about Nicholson from other MBTA employees.  The manager also
showed Samrin Ferrari's Facebook posts discussing Nicholson.
The posts included the following:

- FRANCINE MY BEAUTIFUL BABY, I'M HERE AT DUNKIN
  DONUTS...FRANCINE YOU RULE BABY.

- BABY EVERYTIME I SEE THE GREEN LINE GO BY HERE ON BEACON
  STREET IN BROOKLINE & BRIGHTON THE C TRAIN I'M ALWAYS
  LOOKING TO SEE IF YOUR[sic] DRIVING TODAY, WELL YOU CAN'T
  BLAME ME I WANT TO SEE YOUR STUNNINGLY BEAUTIFUL GORGEOUS
  FACE & SEXY LIPS BABY.

- BABY THIS CRUSH I HAVE ON YOU IS A NASTY ONE...

- I LOVE YOU SWEETHEART, I KNOW YOUR[sic] MARRIED, YOUR
  HUSBAND IS AWAY RIGHT NOW, I WAS TOLD BY ONE OF YOUR T
  CO-WORKERS, BUT BABY I FOUND A SPACE FOR YOU IN MY HEART
  FOR THE REST OF MY LIFE . . .

Ferrari also posted a drawing of a man and a woman kissing,
with the caption, "JEFFREY AND MY GORGEOUS SWEETHEAR FRANCINE
MAKING OUT FOREVER . . . ."

Samrin immediately informed two Green Line supervisors, Cameron and Gomes, and wrote up an incident report summarizing the conversation with the manager and attaching photographs of the Facebook posts. Cameron and Gomes, in turn, contacted TPD and other MBTA officials, including Nicholson's supervisor, Tamieka Thibodeaux, to report Ferrari's behavior. A memo from Gomes stated that the Dunkin Donuts manager was extremely concerned for [plaintiff's] safety because Ferrari made

> obscene comments when MP Nicholson enters the establishment [and told other customers about] things he says he would "like to do to [her]."

Thibodeaux was also copied on a follow-up email from Gomes, sent at approximately 11:00 AM, in which Gomes reported that she had spoken directly to the Dunkin Donuts manager who confirmed Samrin's report and expressed concern for his own safety given Ferrari's past aggression towards other customers. Gomes stated that she had instructed the manager to call the Boston Police Department ("BPD") if any issues arose during Nicholson's afternoon shift that day.

After receiving the reports from Samrin and Gomes, Thibodeaux called plaintiff to discuss Ferrari's behavior. The parties differ as to what was said during parts of that conversation but agree that Thibodeaux altered Nicholson's scheduled route for the day and asked if she wanted to utilize

-5-

the MBTA's Employee Assistance Program ("EAP"), which provides counseling services to employees.  They also agree that Nicholson declined the offer for EAP.  According to the MBTA, Thibodeaux instructed plaintiff to contact TPD and the MBTA's Operations Control Center ("OCC") in the event of any future issues with Ferrari.

Nicholson denies that Thibodeaux told her to contact TPD or OCC and claims that the only reason she declined EAP was because Thibodeaux downplayed any potential danger that Ferrari posed to her.  She alleges that Thibodeaux told her that Ferrari had only expressed an interest in "being her valentine," but not that the report included 1) the highly sexual nature of Ferrari's Facebook posts and comments to other customers, 2) Ferrari's mental instability and 3) the indication in Ferrari's Facebook posts that another MBTA employee had given him personal details about Nicholson (i.e., that Nicholson was married and her husband was "away.").

Nicholson does acknowledge that, when Thibodeaux asked if she was aware of Ferrari, she confirmed as much, telling Thibodeaux that he had been "overly complimentary" of her appearance but that she had always "kept things cordial" and was not otherwise concerned.

The next day, January 23, 2018, TPD Detectives Rutledge and Conway surveilled the Dunkin Donuts.  They observed Ferrari entering the store around 6:20 AM and making remarks about Nicholson's looks to other customers.  The officers confronted Ferrari about his obsession with Nicholson, informing him that Nicholson was married and had no interest in him.  They instructed Ferrari that he was not to contact Nicholson directly, board any of her trains or speak to other employees about her.  Ferrari accepted those conditions and admitted that he had a problem with obsessions, had seen a therapist about it and had not taken his prescribed medication for several weeks.

Detective Rutledge called Nicholson later that morning and informed her about his conversation with Ferrari.  Nicholson declined his offer to press charges and stated that she would wait to see what happened going forward.  Rutledge advised her to use her street car radio to contact OCC and TPD if Ferrari made any further contact with her, either directly or indirectly.  He also provided her with his cell phone number in case she wanted to contact him directly.

Nicholson again asserts that she declined to press charges because Rutledge did not fully advise her about the severity of Ferrari's actions.

c. **Harassment Between January, 2018, and September, 2019**

Nicholson contends that, following the initial reports of Ferrari's behavior, he continued to stalk her at her MBTA stops, appearing at stops along her route and following her on foot. She does not provide the approximate dates, times, locations or frequency of those incidents.

Nicholson avers that whenever Ferrari appeared, she would verbally report the incident to whichever MBTA official happened to be on-site at the time and ask him/her to call the police. According to Nicholson, each official would respond by instructing her to hide in her trolley booth and continue her route.  Plaintiff also explains that, out of fear for her safety, she began to enlist a male co-worker to accompany her to restrooms and when walking between shifts.

Defendant denies that any such instances of harassment occurred, but, if they did, contends that no one at the MBTA had actual or constructive knowledge of them because plaintiff never reported them.

Nicholson acknowledges that she did not call OCC, TPD or Detective Rutledge to report subsequent incidents.  According to plaintiff, MBTA policies prohibiting cell phone use while on duty and the congestion of the train radio system made it

-8-

difficult to seek immediate help during such encounters. Defendant vigorously disputes that allegation.

Plaintiff also insists that she did not file written reports of her harassment because she assumed the officials to whom she made verbal reports would do so. She claims that she requested a route transfer from her union but was rebuffed and instructed to "use the same process as everyone else" to get a new route assignment.

### d. The September, 2019 Incident

On September 10, 2019, Nicholson saw Ferrari when she visited the Dunkin Donuts but she did not speak to him. The next day, before she began her shift, she witnessed Ferrari standing on Beacon Street across from the Cleveland Circle stop. Nicholson suspected that he had been waiting for her trolley but she refused to open the door for him. She used her trolley radio to call OCC for help. TPD officers and Gomes arrived on scene shortly thereafter but Ferrari had already fled.

On September 12, 2019, plaintiff spoke with Allen, another MBTA supervisor, about the latest incident. The parties dispute what was said during that conversation. The MBTA claims that plaintiff did not specifically ask to be moved to another route but rather "inquired generally about the possibility of exploring moving her work location." Allen then advised

-9-

plaintiff to contact her union representative because transfers were governed by the union's collective bargaining agreement ("CBA"). Nicholson indicated that she would do so.

Nicholson, to the contrary, alleges that she specifically asked Allen about moving to a safer MBTA route but Allen dismissed her request, saying that she (Allen) "did not have anything to do with" transfer requests. According to Nicholson, Allen did not mention the union or the CBA.

The following day, TPD detectives located Ferrari at his residence. Ferrari admitted that he had attempted to board plaintiff's trolley. The detectives again instructed Ferrari to stay away from plaintiff, including staying away from the Dunkin Donuts.

### e. Aftermath: Criminal Proceeding, Leaves of Absence, MCAD Complaint and Requests for Accommodation

Plaintiff claims that, on September 17, 2019, she attempted to file a grievance with her union but was told she could not do so because "the conduct was not work related." Three days later, she commenced authorized leave under the Family Medical Leave Act ("FMLA").

On September 23, 2019, Nicholson spoke with Detective Conway and informed him that she wanted to obtain a restraining order against Ferrari. The parties differ as to whether, and to

-10-

what degree, TPD assisted Nicholson in pursuing criminal charges against Ferrari or obtaining the stay-away order. Nevertheless, Nicholson obtained such an order one week after her discussion with Detective Conway. In November, 2019, a complaint charging Ferrari with criminal harassment was issued in Brookline District Court. The disposition of the case was finalized in February, 2022, when defendant pled guilty to the charge.

Plaintiff was originally slated to return to work in October, 2019, but after she received a diagnosis post-traumatic stress disorder ("PTSD"), the MBTA extended her return-to-work date to January, 2020.

In January, 2020, Nicholson filed a complaint against the MBTA and her union (Boston Carmen's Union, Division #589) with the Massachusetts Commission Against Discrimination ("MCAD"), alleging sex discrimination and failure to accommodate her PTSD. Among the allegations, plaintiff claimed that, at some unspecified time, she went to her union to request a route change but was told that she would "need to use the same process as everyone else to get a different route." The MBTA denied liability, asserting that Ferrari's conduct occurred off MBTA property and that it had taken appropriate action. The MBTA also responded that any action by plaintiff's union was not attributable to the MBTA.

While the MCAD matter was pending, correspondence between Nicholson and the MBTA's Leave Management Team ("LMT") reflect that she requested two additional leave extensions which were granted in full: first from January, 2020 to April, 2020, and then from April, 2020 to July, 2020. In each letter granting the request, the MBTA reminded Nicholson to contact her Leave Coordinator to discuss any workplace accommodation requests.

In early July, 2020, plaintiff submitted her fourth request to extend her leave until October, 2020. Defendant granted the request, in part, extending her leave until August 31, 2020. The letter once again reminded plaintiff to reach out to her Leave Coordinator with any accommodation requests. In a follow-up letter, plaintiff's counsel asked LMT to reconsider its decision to "reject the proper medical documentation" provided in support of plaintiff's request for leave until October, 2020. LMT thereafter approved a further extension until January, 2021.

In late January, 2021, Nicholson's medical providers again submitted letters opining that she was not fit to resume work due to her ongoing PTSD. One doctor indicated unequivocally that Nicholson was not fit to return to work, while another stated that she "might" be able to function if transferred to another route. That doctor indicated, however, that transfer did not appear to be a "readily available solution for her."

LMT continued to provide leave extensions until July, 2021, at which point members of the LMT had a discussion with Nicholson regarding her anticipated return-to-work date. During that conversation, plaintiff avers that she requested to be temporarily transferred to a light-duty position in Customer Service or another non-driving position until the criminal case against Ferrari had concluded. The MBTA declined, claiming that there were no light-duty positions available. Defendant granted plaintiff yet another leave extension until October, 2021.

In October, 2021, plaintiff once again requested a leave extension. As grounds, her therapist explained that plaintiff was unable to return to work until the criminal proceeding against Ferrari was concluded. Plaintiff's counsel averred that Nicholson could return to work before the proceeding was complete so long as her accommodation requests were granted.

Lawyers for the MBTA initially denied the request, explaining that a request with no expected return-to-work date was per se unreasonable. Defendant further argued that plaintiff's position was contradictory and did not articulate why her ability to perform her job was dependent upon the conclusion of the criminal proceeding. Despite the dispute,

defendant approved a final leave extension until June, 2022.[2]  At the time, plaintiff had received 33 months of FMLA leave.

Upon her return to work, plaintiff was provided with her own hand-held radio to contact TPD and OCC in case Ferrari attempted to contact her.

### f. Procedural History

In July, 2022, Nicholson withdrew her MCAD complaint and filed the instant suit against the MBTA in Suffolk Superior Court, asserting claims under federal and state anti-discrimination laws.  Defendant timely removed the case to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446.

Nicholson brings four claims against the MBTA: Count I, discrimination based on gender and sexual harassment in violation of M.G.L. c. 151B; Count II, discrimination based on handicap under M.G.L. c. 151B; Count III, maintaining a hostile work environment under M.G.L. c. 151B; and Count IV, violations of the ADA, 42 U.S.C. § 12101 et seq.

In November, 2024, defendant filed the instant motion for summary judgment on all counts.

---

[2] Ferrari's criminal case was resolved in February, 2022, when he pled guilty to the charge of criminal harassment, was put on GPS monitoring and ordered to stay away from Nicholson and the Green Line.

## II. Motion for Summary Judgment

### a. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing that there remains a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party must show via "submissions of evidentiary quality, that a trial worth issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).

-15-

The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

### b. Application

#### 1. Counts I and III: Sex Discrimination / Hostile Work Environment

As a preliminary matter, although plaintiff asserts distinct claims of "third party sexual harassment discrimination" (Count I) and "hostile work environment" (Count III), those claims are duplicative and allege a single violation of Chapter 151B. See Martinelli v. Bancroft Chophouse, LLC, 357 F. Supp. 3d 95, 102 (D. Mass. 2019) (explaining that "Chapter 151B prohibit[s] employers from discriminating against their employees on the basis of sex [and that] [o]ne way that those provisions are violated is by subjecting an employee to an abusive or hostile work environment").[3]

The Court will therefore treat the complaint as alleging a single violation of sex discrimination on a theory of hostile

---

[3] The labels used by plaintiff in her complaint as to Counts I and III are used interchangeably in other cases to allege a single violation of Chapter 151B. See, e.g., Cagle v. Estes, No. 3:18-CV-10123, 2021 WL 2979029, at *17 (D. Mass. Mar. 24, 2021)(describing a violation of Chapter 151B as "Sex Discrimination/Creation of a Hostile Work Environment"); Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) ("Sexual Harassment and Hostile Work Environment Claim").

-16-

work environment.[4] See <u>Sauer</u> v. <u>Belfor USA Grp., Inc.</u>, 205 F. Supp. 3d 209, 214 (describing how the plaintiff was "bas[ing] her claims for sex discrimination and retaliation upon a hostile work environment theory").

Sex discrimination under Chapter 151B encompasses sexual harassment. <u>Cagle</u>, 2021 WL 2979029, at *17 (quoting <u>Sauer</u>, 205 F. Supp. at 214). A successful claim of a hostile work environment based on sexual harassment requires a plaintiff to prove that:

(1)  she (or he) is a member of a protected class;
(2)  she was subjected to unwelcome sexual harassment;
(3)  the harassment was based upon sex;
(4)  the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;
(5)  sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so; and
(6)  some basis for employer liability has been established.

<u>Ponte</u>, 741 F.3d at 320 (quoting <u>Forrest</u> v. <u>Brinker Int'l Payroll Co.</u>, 511 F.3d 225, 228 (1st Cir. 2007)).

---

[4] To the degree that Count III separately alleges a hostile work environment based on "disability-based neglect," it cannot survive summary judgment. A hostile work environment arises from conduct independent of a failure to accommodate. <u>Carillo</u> v. <u>Constructora Santiago II Corp.</u>, No. 16-2600 (CVR), 2018 WL 11476518, at *9 (D.P.R. Mar. 15, 2018). Specifically, it requires "severe and pervasive" harassment "based upon" Nicholson's disability. <u>Ponte</u>, 741 F.3d at 320. The record demonstrates no such proactive harassment occurred.

-17-

With regard to the final element of employer liability, an employer may be liable for sexual harassment perpetrated by a non-employee if the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. Mod. Cont'l/Obayashi v. MCAD, 445 Mass. 96, 108-09 (2005). The remedial action must be "prompt [and] reasonably calculated to stop the harassment and prevent its recurrence". Cagle, 2021 WL 2979029, at *17.

The MBTA asserts that Counts I and III fail as a matter of law because 1) the majority of the harassment did not occur on MBTA property, 2) there is no evidence that Nicholson was subjected to harassment between January, 2018 and September, 2019 and 3) the MBTA took remedial actions that were both prompt and reasonably calculated to stop the two instances of harassment that did occur. The Court will address each counterpoint seriatim.

### A. Location of the Harassment

The location of the purported harassment is not dispositive. Massachusetts does not impose a requirement that harassment must occur on-premises in order to initiate employer liability, so long as the harassment "affects work terms and conditions or is otherwise sufficiently linked to the

workplace."[5] Cahill v. Silva, 79 Mass. App. Ct. 1122, at *2
(2011); see Salvi v. Suffolk Cnty. Sheriff's Dep't, 67 Mass.
App. Ct. 596, 605-06 (2006) ("In determining whether a work
environment is hostile, significant out-of-work harassment . . .
may be considered as well."). Such a limited reading of the
statute would preclude, for example, a supervisor's lewd
comments made to a subordinate during an off-premises social
event or a co-worker sending inappropriate messages to a
colleague over Zoom.

Here, the sexually offensive comments Ferrari made about
Nicholson over Facebook and to MBTA employees at the Dunkin'
Donuts affected her work conditions and were sufficiently linked
to her workplace. Ferrari's Facebook posts indicated, among
other things, that he often waited for Nicholson at a Green Line
stop along her route and that one of her MBTA coworkers had told
Ferrari that Nicholson's husband was "away." MBTA instructor
Samrin was also informed by the Dunkin Donuts manager that
Ferrari would stay at the store "all day and request personal
information about [plaintiff] from other operators." When the

---

[5] The First Circuit Court of Appeals (the First Circuit") has repeatedly
affirmed the same when assessing hostile work environment claims under Title
VII. See, e.g., Crowley v. L.L. Bean, Inc., 303 F.3d 387, 409-10 (1st Cir.
2002) (plaintiff's frightening interactions with a coworker outside of work
could support why his presence created a hostile work environment); Ferris v.
Delta Air Lines, 277 F.3d 128, 135 (1st Cir. 2001) (rape of a flight
attendant by a coworker during an overnight layover in a hotel paid for by
the airline occurred in the "work environment").

officers arrived at the location to observe Ferrari, he was
talking to an MBTA employee about Nicholson's "good looks."
Defendant also does not dispute that the Dunkin Donuts was
located in close proximity to the Reservoir Campus and that MBTA
employees frequently patronized the store before, during and
after their shifts.

To the extent that defendant seeks to use the location of
the harassment to disprove its actual or constructive knowledge
of the harassment, it fails. One of the undisputed facts in
this case is that defendant did, in fact, have actual knowledge
of at least two instances of Ferrari's harassment. The fact
that officials took the remedial steps highlighted in
defendant's motion is proof of their knowledge and of their
understanding that Ferrari's conduct was affecting (and might
continue to affect) Nicholson's work conditions.

Thus, defendant may be liable for the third-party
harassment which occurred in January, 2018, to the degree
defendant did not take reasonable steps to remediate the
situation.

### B. Additional Instances of Harassment

Plaintiff claims that, between January, 2018 and September,
2019, she was subjected to many instances of harassment as to
which defendant did not take remedial action. In support,

-20-

plaintiff relies exclusively on her own depositions.  Those are
not, however, sufficient to sustain plaintiff's opposition to
summary judgment on this question.

The mere fact that Nicholson's affidavit or deposition
testimony may be self-serving does not discount their weight in
evaluating summary judgment.  Rather, their value is contingent
on whether or not they contain "specific factual information
based upon [the party's] personal knowledge." Id.  If an
affidavit submitted by a plaintiff "merely reiterate[s]
allegations made in the complaint," it is insufficient.
Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46,
53 (1st Cir. 2000).

Here, the deposition testimony on which plaintiff relies
contain allegations based on Nicholson's personal knowledge,
i.e., whether she was subjected to additional harassment between
January, 2018, and September, 2019.  However, her testimony is
barren of the factual details necessary to overcome summary
judgment.

Just as in her complaint, Nicholson avers in her
depositions that there were "multiple incidents" where Ferrari
stalked her at one of her train stops, that she verbally
reported those incidents to various officials, and that several
other co-workers were aware of the harassment, "checking in on

-21-

[her]" or accompanying her while she was walking to different shift locations. She avers that the officials who were present at the scene refused to call the police and instead instructed her to hide in her train booth and continue the trip.

But just as with her complaint, Nicholson provides no factual support for those incidents, including, but not limited to, the approximate number of incidents, an approximate date, time or location of any incident, the name of any co-worker who was aware of the harassment or the name of any supervisor to whom she reported it or requested a transfer.[6]

The only meaningful detail that plaintiff provides in her deposition is her claim that she exchanged text messages with a co-worker, Kim Malone ("Malone"), about the ongoing harassment. Plaintiff states that Malone would warn Nicholson whenever she saw Ferrari loitering at one of the stops along Nicholson's route. Yet Nicholson produces no screenshots of those text messages nor deposition testimony from Malone to support her claims.

---

[6] At most, Nicholson claims that the harassment occurred "on too many dates to recount." In her deposition, she provides last names of a few MBTA officials to whom she made the in-person reports. Yet, when asked, as part of her interrogatory responses, to provide names of individuals who might have evidence in support of her claims, she does not identify any such official. She also does not provide deposition testimony from any official in support of her claim.

Furthermore, plaintiff's justification for failing to report those incidents to any Green Line supervisor, TPD officer or other law enforcement strains credulity. Her story is, in short, that she was subjected to "constant" harassment, causing her to fear for her physical safety, and that her pleas for help went ignored by officials on scene. Nevertheless, plaintiff at no point, either during or after any incident, called TPD or spoke to a supervisor about the problem. Plaintiff justifies this inaction by stating that she assumed the MBTA officials, the very people who purportedly ignored her pleas for help, would report the incidents themselves. Plaintiff persists in that contention, even though she was never contacted by a supervisor to discuss any incident allegedly reported by an official.

After careful consideration, this Court concludes that no reasonable jury could find that additional stalking or harassment occurred between January, 2018, and September, 2019. Plaintiff provides no specifics as to the incidents, including when or how they took place, Cadle Co. v. Hayes, 116 F.3d 957, 961 (1st Cir. 1997), nor does she proffer any deposition testimony (other than her own) from a single witness to provide evidentiary support to her claims, Allard v. Citizens Bank, 608 F. Supp. 2d 160, 174 (D. Mass. 2009). Furthermore, although the

-23-

Court must draw inferences in plaintiff's favor, those inferences must be reasonable, O'Connor, 994 F.2d at 907, and here, they are not.

As such, plaintiff's allegations as to the steps defendant did (or did not) take to remediate those purported instances of harassment are irrelevant in determining the reasonableness of defendant's remedial steps.

### C. Remediation of Two Harassment Incidents

An assessment of whether an employer's responses were "prompt and appropriate" to remediate instances of sexual harassment "often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest, 511 F.3d at 232. However, when it is undisputed that an employer did take remedial action, "the reasonableness of [that action] can be determined as a matter of law." Mod. Cont'l, 445 Mass. at 110; Forrest, 511 F.3d at 232. The question is, given the totality of the circumstances,

> [d]id the [MBTA] take prompt, effective, and reasonable remedial action or immediate and appropriate corrective action once it realized or should have realized that one of its employees was being victimized by a third party's harassment?

Mod. Cont'l, 445 Mass. at 108.

Here, the parties agree on a number of the steps taken by MBTA personnel to address the two instances of harassment.

-24-

With regard to the January, 2018 incident, the record demonstrates that:

1) Samrin reported Ferrari's inappropriate behavior and Facebook posts to her supervisors as soon as she learned of it from the Dunkin Donuts manager;

2) Those supervisors immediately passed along the disturbing report to other Green Line officials and TPD;

3) Green Line supervisor Gomes spoke with the manager of the Beacon Street Dunkin Donuts to confirm Samrin's report;

4) Plaintiff's supervisor, Thibodeaux, changed plaintiff's route for the day to avoid any contact with Ferrari;

5) Thibodeaux discussed the incident with Nicholson and asked her if she wanted to take advantage of the Employee Assistance Program ("EAP"), which Nicholson declined;

6) The next day, TPD surveilled the Dunkin Donuts, confronting Ferrari about his behavior towards Nicholson and instructing him not to contact her in any way; and

7) TPD spoke with Nicholson about Ferrari, including informing her about his mental instability; when asked if she wanted to press charges, Nicholson declined.

The Court concludes that the actions taken by MBTA officials to remediate the harassment were sufficient under the circumstances.

Within a matter of hours after receiving the report of Ferrari's behavior, MBTA officials processed the report up to high-level supervisors, alerted law enforcement, followed up directly with the relevant witnesses, temporarily removed

Nicholson to a different train route for her own protection and
discussed Ferrari's behavior with Nicholson directly.

Within 24 hours after the report, TPD officers had
surveilled the scene, identified Nicholson's harasser and
instructed him to stay away from her.  The same day, one of the
responding detectives followed up with Nicholson.  He described
his encounter with Ferrari, asked if Nicholson wanted to press
charges and provided her with his personal cell phone number in
case she needed to contact him directly.

Nicholson's primary criticism is that Supervisor Thibodeaux
did not disclose the extent or seriousness of Ferrari's behavior
at the time Nicholson was asked if she wanted to report Ferrari
to police.  Purportedly, she was not told about the sexual
nature of the Facebook posts, the indication therein that he was
looking for her at train stops, his discussions of (or attempts
to discuss) plaintiff with her co-workers or the fact that
Ferrari was mentally unstable.

At the time Thibodeaux spoke with Nicholson, however, the
MBTA was not aware of Ferrari's mental instability.  Ferrari
self-reported his mental challenges to the TPD detectives who
confronted Ferrari the day after Thibodeaux's conversation with
Nicholson.  Nicholson also acknowledges that when the TPD

-26-

detectives spoke with her, they did inform her of Ferrari's mental state and his history of sexual obsessions.

Nicholson disputes whether Thibodeaux instructed her to contact OCC and TPD if Ferrari reappeared but, again, she acknowledges that Detective Rutledge not only directed her to OCC and TPD but also provided her with his phone number in case she needed to contact him directly.

As such, any purported deficiency in Thibodeaux's disclosures to Nicholson is immaterial to whether the response of the MBTA was reasonable. Within 24 hours of Thibodeaux's discussion with Nicholson, Detective Rutledge had provided her with the very information she claims Thibodeaux denied her.

With respect to the September, 2019 incident, the parties do not dispute that:

1) Plaintiff used the two-way radio in her booth to alert OCC and TPD to Ferrari's presence;

2) TPD responded immediately to the radio call;

3) TPD took plaintiff's statement that day and followed up with her several times thereafter;

4) Plaintiff discussed the possibility of a transfer with a Green Line supervisor, Temesha Allen, but was not given one; and

5) Plaintiff requested and was approved for FMLA leave one week following the incident.

The Court finds that the MBTA's response to the September, 2019, incident was reasonable and was properly calculated to remediate the harassment.

The parties primarily dispute whether Nicholson requested a transfer from Supervisor Allen and how Allen responded to her request. Plaintiff claims that she approached Allen and requested to be transferred to a different route due to safety concerns to which her supervisor responded that she "did not have anything to do with" transfer decisions. According to the deposition of MBTA designee Alicia Gomes, she was not aware of plaintiff ever asking for any transfer off of her route. Instead, according to defendant, Nicholson merely "inquired generally about the possibility of exploring moving her work location." Allen advised Nicholson to contact her union representative to discuss a location change, which Nicholson indicated she would do.

Nicholson argues, in effect, that defendant could have done more to facilitate her request for a transfer but that does not detract from the reasonableness of defendant's conduct. Mod. Cont'l, 445 Mass. at 109. As Nicholson's own MCAD complaint alluded, she understood that she needed to pursue a route transfer through her union.

-28-

Finally, plaintiff attempts to cast doubt on the reasonableness of defendant's remedial steps by arguing, in her opposition to the summary judgment motion, that Ferrari continued to harass her even after she obtained a stay-away order in September, 2019.  That is not contradicted by plaintiff's own deposition testimony that after the September, 2019, incident, the only times she has seen Ferrari were when she attended court in connection with the harassment prevention order and at his criminal proceeding.  In any event, an employer is not required to eliminate the possibility of harassment by a third party in order to be shielded from liability.  The inquiry focuses on the reasonableness of the employer's remedial efforts, not their ex-post efficacy. Mod. Cont'l, 455 Mass. at 96.

The Court concludes that, under the circumstances, the MBTA took reasonable steps to remediate the harassment to which plaintiff was subjected.  No reasonable jury would find otherwise.  Defendant's motion for summary judgment on Counts I and III will be allowed.

### 2. Counts II and IV: Reasonable Accommodation

Defendant has also moved for summary judgment with respect to plaintiff's claims for failure to make reasonable accommodation under both the ADA and M.G.L. c. 151B, which are

evaluated using nearly identical frameworks.[7] Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012).

To prevail on a claim of failure to make reasonable accommodation under M.G.L. c. 151B § 4(16), a plaintiff must show that 1) she is a qualified handicapped person, 2) she requested a reasonable accommodation and 3) the employer failed to accommodate her. Russell, 437 Mass. at 444. A handicapped person is deemed "qualified" if she is

> capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to [her] handicap.

M.G.L. c. 151B, § 1(16).

Similarly, to bring a failure to accommodate claim under the ADA, a plaintiff must show that 1) she has a qualifying disability under the ADA, 2) she is qualified to perform her job with or without reasonable accommodation and 3) her employer failed to reasonably accommodate her despite knowing of her disability. Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017).

---

[7] Minor distinctions between reasonable accommodation claims under Chapter 151B and the ADA are not relevant to the analysis in this case. See Russell v. Cooley Dickinson Hosp., Inc., 443 Mass. 443, 454 (2002) (explaining that the ADA considers reassignment to vacant positions as a reasonable accommodation whereas Chapter 151B considers only accommodations within plaintiff's current position).

-30-

When an employee requests an accommodation for a qualifying disability, both the ADA and Massachusetts law require that the parties engage in an "interactive process in good faith to develop reasonable accommodations." Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 77 (1st Cir. 2024). However, an employer's failure to engage in that process does not, on its own, constitute a failure to accommodate. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 456 (1st Cir. 2016). The employee must also demonstrate that, had the employer engaged in the interactive process, the parties would have identified a reasonable accommodation. Id.

Several facts relevant to a reasonable accommodation inquiry are not in dispute, namely, 1) that Nicholson had a qualifying disability under both the ADA and Chapter 151B, Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 64 (1st Cir. 2020), 2) that she was competent to perform her workplace duties, 3) that she requested several accommodations, thus initiating the obligation to engage in the interactive process and 4) that defendant granted some accommodations but not others.

Specifically, the parties agree that the MBTA provided Nicholson with an extended leave of absence between September, 2019, and June, 2022, including at least five extensions of her return-to-work date, as well as a portable radio to alert MBTA

-31-

officials if Ferrari re-initiated his harassment.  The parties
also agree that Nicholson requested, but the MBTA did not
provide, a variable or light-duty work assignment.  Defendant
instead invited plaintiff to apply for new positions posted on
the MBTA intranet if she wished to avoid traveling to the train
stop where she anticipated she would encounter Ferrari.

Where the parties disagree is the reasonableness of the
accommodations requested by plaintiff but rejected by defendant
and whether both parties engaged in the interactive process in
good faith.

Although reasonableness of a requested accommodation is, as
general rule, an inquiry best left for a jury, García-Ayala v.
Lederle Parenterals, Inc., 212 F.3d 836, 647 (1st Cir. 2000),
the fact-intensive nature of the inquiry "does not insulate
disability-discrimination cases from summary judgment," Delgado-
Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 128 (1st Cir.
2017).  In fact, it is the plaintiff's burden at summary
judgment to demonstrate that a requested accommodation is
facially reasonable. Reed v. LePage Bakeries, Inc., 244 F.3d
254, 259-60 (1st Cir. 2001).

Plaintiff requested two categories of accommodations,
namely, extensions of her FMLA leave and on-site accommodations
once she returned to work.  The Court addresses each in turn.

-32-

### A. Extensions of FMLA Leave

As discussed above, the MBTA granted in full Nicholson's first three requests for extension of her leave, moving her return-to-work date from October, 2019 to July, 2020.  LMT denied her fourth extension request, in part, by limiting her extension to two months, rather than the four months she had requested.  Nicholson characterizes that partial denial as both a failure to reasonably accommodate and a refusal to participate in an interactive process to craft alternative accommodations. Not so.

First, the MBTA is only required to offer accommodations that are reasonable, "not necessarily the accommodation sought by the employee." Sayian v. Verizon New Eng. Inc., No. 19-cv-11845-DJC, 2022 WL 375287, at *6 (D. Mass. Feb. 8, 2022) (quoting Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 169 (D. Mass. 2004)).  The First Circuit has frequently found requests for extended leaves of absence to be unreasonable. Garcia-Ayala, 212 F.3d at 649; Sarkisian v. Austin Prep. Sch., 85 F.4th 670, 676 (1st Cir. 2023)(citing Delgado-Echevarría, 856 F.3d at 130).  Regardless, upon reconsideration, the MBTA granted the requested leave extension for the full four months.

The MBTA's initial refusal also does not violate its obligation to engage in the interactive process in good faith.

-33-

Refusal to provide a specific accommodation is not per se

evidence of bad faith on the part of the employer. Kohl's, 774

F.3d at 132.  Moreover, the communications between the parties

demonstrate that both sides engaged in the interactive process.[8]

Following LMT's notification that it would only extend

plaintiff's leave until July, 2020, plaintiff's counsel promptly

wrote to defense counsel asking defendant to reconsider its

decision.  Defendant did so, extending plaintiff's leave to

January, 2021.

Plaintiff similarly cites defendant's resistance to her

November, 2021, request for further leave as evidence of a

failure to accommodate or engage in the interactive process.

Specifically, plaintiff's counsel, in a November, 2021, letter

to the MBTA's Leave Management Team, insisted that Nicholson

could not return until the criminal case against Ferrari had

concluded.  Yet in that same letter, counsel made clear that

Nicholson would be able to return to work regardless of the

outcome of the case, i.e., even if Ferrari was not sentenced to

a prison term, Nicholson could return to work so long as the

---

[8] Although, in an interrogatory response, plaintiff claims that, in an email, an MBTA supervisor stated that she was never asked to, and did not, participate in an interactive dialogue, plaintiff did not produce that email.

MBTA provided her with reasonable accommodations, including reassignment to a different route.

As a general matter, indefinite leave is not a reasonable accommodation. Kahriman v. Wal-Mart Stores, Inc., 115 F. Supp. 3d 153, 166 n.13 (D. Mass. 2015) ("It is well-settled that an employer need not provide an indefinite leave of absence as a reasonable accommodation."). Moreover, Nicholson drew no connection between the conclusion of Ferrari's criminal case and her ability to perform her job functions. Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010) ("To make out a reasonable accommodation claim, a plaintiff must show that a proposed accommodation would enable her to perform the essential functions of her job."). In fact, the request demonstrated that she believed herself to be capable of returning to her position, so long as her other accommodation requests were met.

Regardless of the reasonableness (or lack thereof) of plaintiff's additional leave requests, defendant ultimately granted them to the extent of just under three years.

Plaintiff also alleges that she was "pressured" to return to work despite the MBTA's repeated approvals of her requests for extended leave. Nicholson cites no evidence to support that claim, nor does she describe the form in which such "pressure" was exerted, other than to refer vaguely to correspondence

between LMT and her counsel negotiating the terms of her return to work.   Plaintiff cannot characterize any denial of her requests as improper pressure, especially on the heels of three prior, unquestioned continuations of her leave. See <u>Kliskey</u> v. <u>Making Opportunities Count, Inc.</u>, No. 22-cv-40123-MRG, 2025 WL 959257, at *7 (D. Mass. Mar. 31, 2025) ("An employer's insistence that an employee return to work following the expiration of FMLA leave does not constitute coercion or termination . . .").

The Court concludes that defendant's leave-related accommodations were more than reasonable.  The MBTA provided Nicholson with 33 months of FMLA leave (several more than would have been reasonable in light of plaintiff's basis for her October, 2021 extension request).  Defendant's pushback at various stages in the negotiations with plaintiff's counsel does not constitute either a failure to accommodate or a failure to engage in the interactive process.  Finally, plaintiff does not dispute that she was able to return to work in June, 2022.

### B.  Reassignment Accommodations

According to the correspondence between LMT and plaintiff's counsel, Nicholson requested reassignment to a different position at the same pay grade that was

-36-

either a light duty position or a driving position with an
agreed Safety Plan in place . . . include[ing] the
following components: (i) OAD variable assignment [where
she would drive on different train lines]; (ii) Hand-held
radio and other appropriate technology; and, (iii)
Emergency Response plan.

As a preliminary matter, under Chapter 151B, a request to
transfer to a different position from the one for which
plaintiff was initially hired is not considered a reasonable
accommodation. Russell, 437 at 454. Plaintiff's request for a
light-duty assignment, i.e., a non-driving position, is thus not
reasonable under Count II. In any event, plaintiff states in
her deposition that she did not want to explore light-duty
positions because she "liked the job that she had."

Similar contradictions appear throughout plaintiff's
deposition with regard to her requests for reassignment to a
driving position with a different route.

For example, plaintiff indicated in her response to
interrogatories that she requested assignment to routes that
"avoid geographic regions of the city including the Green Line
and Mattapan without a decrease in pay or loss of ranking." In
her deposition testimony, however, she states that she told the
MBTA that she "want[ed] to stay on the Green Line" and
acknowledges that the Mattapan line does not pass by the area of
Beacon Street that she was hoping to avoid.

-37-

Nicholson also insists that she did not choose to drive on the "E" line or Mattapan routes (i.e., routes that did not travel past locations or include stops where she had seen Ferrari) because it would lower her rating and reduce her pay. She admits in her deposition, however, that she did not know how the pay of people working on other lines compared to her compensation on her current route because she did not look up the information on the MBTA intranet. It is all the more confusing that plaintiff admits in her deposition that, upon returning to work in June, 2022, she participated in the process of choosing her route assignment and proactively chose the split route of the "B" and "C" branches of the Green Line.

Nevertheless, although reassignment to a vacant position may be a reasonable accommodation, it is Nicholson's burden first to show that such a position exists. Lang, 813 F.3d at 456. She does not do so. Nicholson admits that she never once accepted the MBTA's invitation to explore the alternative positions available to her so that she might determine if there were any positions that would meet the numerous criteria she sets forth in her pleadings, namely, a Green Line driving position that would not 1) involve stops near the area where she had been harassed, 2) decrease her pay, 3) affect her rank, 4)

-38-

increase her commute time or 5) conflict with her attendance at a support group.

This Court concludes that no rational finder of fact could find a genuine issue of material fact under the circumstances present here.  Plaintiff's preferred reassignment was a moving target which she had the initial burden of identifying.  She did not do so.

Next, plaintiff requested both

1) a hand-held radio [that] will allow her a direct means to call Security or [TPD], if necessary, in the event that Mr. Ferrari is spotted in her vicinity . . . [and]

2) the appropriate technology in addition to the currently proposed hand-held radio so that she can adequately communicate if an emergency situation arises.

The MBTA accommodated Nicholson's first request.  As to the second, plaintiff does not define what additional technology she believes was necessary, nor does she explain why the hand-held radio was not sufficient on its own.  Thus, her request was not "sufficiently direct and specific . . . [nor does she] explain[s] how the accommodation [was] linked to [her] disability." Jones, 696 F.3d at 89.

Finally, plaintiff requested that the MBTA develop an "Emergency Response Plan," i.e., establish a protocol in the event Nicholson requests emergency assistance.  Once again, plaintiff fails to demonstrate the prima facie reasonableness of

-39-

that request.  Nicholson does not explain why the general protocol, as laid out in the MBTA's harassment and violence prevention policies, would not adequately accommodate her PTSD. Furthermore, she does not identify any specific steps with which she would have defendant supplement its current policies. See Freadman v. Metro. Property & Cas. Ins. Co., 484 F.3d 91, 102-03 (1st Cir. 2007).  As demonstrated by the MBTA's timely response to the September, 2019, incident, the typical protocol followed by TPD reasonably minimized Nicholson's contact with Ferrari and sought to prevent any further harassment.

In sum, there is no genuine dispute of material fact as to whether defendant reasonably accommodated plaintiff's PTSD after her return to work.  Defendant provided her with a personal radio to communicate directly with TPD and OCC and invited her to apply for any vacant position for which she wanted to be considered.  Nicholson fails to show why any other requested accommodation that the MBTA declined to make was facially reasonable.  The MBTA therefore was under no legal obligation to provide it.

**ORDER**

For the foregoing reasons, the motion of defendant, the Massachusetts Bay Transportation Authority, for summary judgment (Docket No. 33) is, as to all claims, **ALLOWED**.


**So ordered.**

Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge


Dated:  May 12, 2025